IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

MAMMAR AMEUR,               )
                           )
    Plaintiff,           )
                           )
v.                         )        Case No. 1:12-cv-823 (GBL/TRJ)
                           )
ROBERT M. GATES, *et al.*,  )
                           )
    Defendants.          )

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendants' Motions to Dismiss (Docs. 77, 80).

The case concerns an Algerian citizen's claims against various former government officials

concerning alleged abuse, mistreatment, and torture committed by the United States military

during Plaintiff's detention in multiple countries. Defendants' motions present three issues

before the Court.

The first issue is whether the United States of America, pursuant to 28 U.S.C. §

2679(b)(1) ("the *Westfall* Act"), properly substituted itself for the named individual defendants

on Counts I-VI, where Plaintiff alleged violations of customary international law and the Geneva

Convention. The Court holds that substitution was proper, as Plaintiff's claims seek relief

against federal employees for harms resulting from acts or omissions occurring within the

employees' scope of employment. The Court finds that neither of the *Westfall* Act's two

exceptions to substitution applies here. Furthermore, because state law determines the scope of

the individual defendants' employment for the purposes of the *Westfall* Act, the Court finds that

the acts or omissions fall within the scope as defined by Virginia law.

The second issue is whether the Military Commissions Act ("MCA") divests the Court of subject matter jurisdiction to consider Plaintiff's claims seeking relief for harm related to his detention, transfer, and confinement in Afghanistan and Guantanamo Bay. The Court holds that it lacks subject matter jurisdiction here because the MCA bars courts from hearing claims related to detention, transfer, treatment, and conditions of confinement brought by individuals determined by the United States to be enemy combatants. Plaintiff's Complaint acknowledges he was determined to be an enemy combatant and that his claims relate to his detention and treatment at United States military facilities.

The third issue is whether sovereign immunity bars Plaintiff's claims against the United States, Counts I-VI, for harms occurring on foreign soil. The Court holds that sovereign immunity bars Plaintiff's claims for two reasons. First, the Federal Tort Claims Act ("FTCA"), while a partial waiver of sovereign immunity, does not act as a waiver where claims arise from a source other than state law, such as customary international law. Second, the FTCA does not waive sovereign immunity for harms occurring on the soil of another sovereign.

## I. BACKGROUND and PROCEDURAL HISTORY

Plaintiff Mammar Ameur, a fifty-four year old Algerian citizen, brings this action seeking relief for violations of customary international law, the Geneva Convention, the First and Fifth Amendments of the United States Constitution, and the Religious Freedom Restoration Act ("RFRA"). (2d Am. Compl. ¶¶ 1, 12, Doc. 65.) Plaintiff names various former high-level government executive individuals, including former Secretaries of Defense Robert Gates and Donald Rumsfeld, as defendants ("Individual Defendants"). (*Id.* ¶¶ 13-39.) Plaintiff also names one hundred John Does as defendants. (*Id.* ¶¶ 40-43.) Plaintiff's claims arise from being taken into custody in Pakistan and his time in detention in United States military facilities at Bagram

Air Base, Afghanistan and Guantanamo Bay, Cuba. Plaintiff alleges that the Individual Defendants acted beyond the scope of their authority and employment in their involvement as decision-makers, supervisors, policy creators, or other roles connected with acts carried out by the United States military. (*Id.* ¶¶ 4-7.)

Plaintiff alleges that he was in Pakistan in 2002 after fleeing a violent civil war in his home country of Algeria. (*Id.* ¶ 53.) He was taken into custody during a July 2002 raid in Pakistan, despite not being the target of the raid. (*Id.* ¶ 54.) Plaintiff was taken to a jail in Islamabad, Pakistan and was soon thereafter hooded, chained, and transferred to another prison within the country. (*Id.* ¶¶ 54-55.) Plaintiff alleges that during this time he was not interrogated, and given only food with hot peppers and one set of clothes during the six months he spent in that facility. (*Id.* ¶¶ 55-56.)

Plaintiff was transferred to Bagram Air Base, Afghanistan in January 2003, where he remained until March 23, 2003. (*Id.* ¶ 58.) During his time at Bagram, Plaintiff was allegedly subjected to humiliating treatment, beatings, extreme temperatures, sleep deprivation, cavity searches, constant music, and other unpleasant and jarring treatment. (*Id.* ¶¶ 59-61.) Plaintiff further alleges that guards denied him a copy of the Qur'an for a period of time, often scattered the pages across his cell, and prevented Plaintiff from adhering to his prayer schedule and regimen. (*Id.* ¶ 62.) At no time during his detention at Bagram was Plaintiff given an explanation for his apprehension and detention, a notice that he was charged with any crime, or an opportunity to challenge his detention. (*Id.* ¶ 64.)

Plaintiff was transferred to Guantanamo Bay, Cuba on March 23, 2003, where he remained in detention until October 8, 2008. (*Id.* ¶¶ 65-66.) This transfer involved a cavity search, being forced into stressful positions for long periods of time without food or water,

blindfolding, and again being hooded. (*Id.* ¶ 65.) Plaintiff alleges that he was subject to severe mistreatment during his time at Guantanamo Bay, including the following: beatings, forced nudity, touching of his genitals by male and female guards alike, spraying of mace, denial of water so that detainees could not wash off the mace, constant noise and floodlights, isolation, and frequent interrogation. (*Id.* ¶¶ 67-70.) Plaintiff suffered further injury due to the inadequacy of the footwear provided to him. (*Id.* ¶¶ 73-74.) Plaintiff alleges that he again faced difficulties in possessing a Qur'an. (*Id.* ¶ 71.) After arriving at Guantanamo Bay, Plaintiff was prevented from contacting his family until June 2007. (*Id.* ¶ 72.)

Plaintiff alleges that he was not determined to be an "enemy combatant" until October 2004, approximately two years after his initial detention. (*Id.* ¶ 79.) Plaintiff further alleges that in November 2005, three years prior to his release, he would have been eligible for release from Guantanamo and return to Algeria. (*Id.* ¶ 81.)

Plaintiff alleges that former Secretaries Gates and Rumsfeld, as well as other high-level officials, knew that innocent men were being held at Guantanamo Bay yet failed to release these individuals due to anticipated political repercussions. (*Id.* ¶¶ 84-86.) These individuals allegedly "oversaw a system of detention, coercive interrogations and harsh and humiliating conditions" at Bagram and Guantanamo. (*Id.* ¶ 88.) Plaintiff further alleges that various Defendants were involved in requests for, debates about, and approval of "aggressive interrogation techniques" that were "tantamount to torture." (*Id.* ¶¶ 88-101.) Plaintiff maintains that other Defendants were involved with the implementation and oversight of the flawed process of determining enemy combatants, the refusal to bring detention facilities in compliance with the Geneva Conventions, and the failure to curb abusive practices in detention facilities. (*Id.* ¶¶ 104-16.) Plaintiff alleges that former Secretary Gates's knowledge of these practices and

4

failure to provide proper guidance to subordinates or otherwise end abusive processes subjects him to liability for these acts or omissions. (*Id.* ¶¶ 115-19.)

**Procedural History**

Plaintiff filed this suit in the Western District of Washington on October 6, 2011. (Doc. 1.) The case was transferred to this Court on July 25, 2012. (Doc. 55.) In its order transferring the case to this Court, the Western District of Washington granted Defendants' motion to dismiss Plaintiff's Amended Complaint for lack of personal jurisdiction as to all defendants except Robert Gates. (Doc. 54.) On September 12, 2012, Plaintiff filed his Second Amended Complaint in this Court.[1] (Doc. 65.)

In his Second Amended Complaint, Plaintiff asserts nine claims for relief. Counts I through VI ("nonconstitutional claims") seek relief for violations of customary international law and the Geneva Convention pursuant to the Alien Tort Statute. Count I alleges prolonged arbitrary detention. (*Id.* ¶¶ 122-26.) Count II alleges cruel, inhuman, or degrading treatment. (*Id.* ¶¶ 127-31.) Count III seeks relief for torture. (*Id.* ¶¶ 132-36.) Count IV seeks relief for the targeting of a civilian. (*Id.* ¶¶ 137-42.) Count V alleges a violation of due process. (*Id.* ¶¶ 143-47.) Count VI alleges forced disappearance. (*Id.* ¶¶ 148-52.)

Counts VII and VIII ("constitutional claims") assert *Bivens* claims against some of the Defendants for constitutional violations. Count VII alleges a Fifth Amendment violation based on Plaintiff's alleged right to due process. (*Id.* ¶¶ 153-58.) Count VIII alleges a First

---

[1]    In filing his Second Amended Complaint, Plaintiff names all individual defendants dismissed by the Western District of Washington and acknowledges that his claims against such defendants are time-barred by Virginia's two-year statute of limitations. (*See* 2d Am. Compl. at 4 n.1.) In doing so for the purposes of preserving for appeal the Washington court's dismissal order, he does not contest dismissal of those individuals in this Court. (*See id.*)

Amendment violation related to the freedom of religion and the freedom of expression and association. (*Id.* ¶¶ 159-65.)

Count IX alleges a violation of the Religious Freedom Restoration Act by certain Defendants. (*Id.* ¶¶ 166-71.)

On December 11, 2012, the United States filed a Notice of Substitution for all Individual Defendants as to Counts I-VI pursuant to the *Westfall* Act, 28 U.S.C. § 2679(b). (Doc. 79.) Thereafter, the Government filed a Motion to Dismiss Plaintiff's nonconstitutional claims for lack of subject matter jurisdiction. (Doc. 80.) On the same day, the Individual Defendants also filed a Motion to Dismiss Counts VII-IX. (Doc. 77.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) requires dismissal where the court lacks jurisdiction over the subject matter of the action. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 301 (4th Cir. 2009) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). In considering a 12(b)(1) motion to dismiss, the plaintiff bears the burden to prove that federal subject matter jurisdiction is proper. *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 371 (4th Cir. 2012) (citing *U.S. ex. rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009)).

Defendants may use two methods to attack a complaint through a 12(b)(1) motion. First, a defendant may present a facial attack upon the complaint where the complaint "fails to allege facts upon which subject matter jurisdiction may be based." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In this situation, the Court assumes the veracity of the plaintiff's allegations. *Id.* (quoting *Bain*, 697 F.2d at 1219). Second, a defendant may seek dismissal by attacking the existence of subject

matter jurisdiction apart from the pleadings, essentially averring "that the jurisdictional allegations [are] not true." *Id.* (quoting *Bain*, 697 F.2d at 1219). When faced with this second type of challenge, the pleadings are regarded as mere evidence, and the Court may to consider evidence outside the pleadings to determine the existence of jurisdiction. *Id.* (citing *Bain*, 697 F.2d at 1219); *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004). As a result, plaintiff's allegations find no presumption of truth, and a dispute of material facts will not preclude the Court from evaluating the merits of claims underlying jurisdiction. *Vuyyuru*, 555 F.3d at 347.

### III. DISCUSSION

The Court grants Defendants' Motions to Dismiss and dismisses Plaintiff's Complaint in its entirety because the Court lacks jurisdiction to hear Plaintiff's claims. The Court grants the motions because the Military Commissions Act ("MCA") divests the Court of jurisdiction to hear Plaintiff's claims. Alternatively, sovereign immunity applies to Plaintiff's nonconstitutional claims, as the *Westfall* Act provides that the United States is the proper defendant for these claims and the Government has not waived sovereign immunity here.

#### A. The Military Commissions Act Bars Plaintiff's Claims

The Court grants the Motions to Dismiss and dismisses Plaintiff's claims because the Military Commissions Act of 2006 ("MCA") divests the Court of jurisdiction to hear Plaintiff's claims regarding his detention, transfer, treatment, and confinement conditions.

In 2006, Congress passed the MCA in light of the Supreme Court's ruling in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006). *See* Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600. In *Hamdan*, the Supreme Court held that the jurisdiction-stripping provision of the Detainee Treatment Act ("DTA") did not apply to habeas actions pending at the time

7

Congress enacted the DTA. 548 U.S. at 575-76. In response to the Court's decision, Congress enacted the MCA four months after *Hamdan*. *See Boumediene v. Bush*, 553 U.S. 723 (2008) ("[W]e cannot ignore that the MCA was a direct response to *Hamdan*'s holding that the DTA's jurisdiction-stripping provision had no application to pending cases."). Section 7 of the MCA provided the jurisdiction-stripping language, stating that

> (1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination[;]

> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

MCA §7(a) (codified at 28 U.S.C. § 2241(e)). In an effort to avoid the invalidation effected in *Hamdan*, the MCA also included a note expressly indicating the law's applicability to all cases pending on or after its enactment. *See* MCA § 7(b).

Congress's attempt to strip courts of jurisdiction again fell under judicial scrutiny in the Supreme Court's examination of the statute in *Boumediene v. Bush*. In *Boumediene*, the Court faced the question of whether aliens detained at Guantanamo Bay held the constitutional privilege of habeas corpus except where withdrawn as permitted by the Suspension Clause in Article 1, Section 9 of the Constitution.[2] *Id.* at 732. The plaintiffs in that case were aliens detained at Guantanamo Bay after being designated enemy combatants. *Id.* The plaintiffs appealed the decision by the Court of Appeals for the District of Columbia stating that MCA § 7

---

[2] The text of the Suspension Clause reads, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. 1 § 9 cl. 2.

stripped all federal courts of jurisdiction to consider their habeas corpus applications, as the plaintiffs were not entitled to the protections of the Suspension Clause. *Id.* at 735-36.

The Supreme Court declared unconstitutional the MCA to the extent it attempted to strip courts of the jurisdiction to consider a petition for writ of habeas corpus by an alien in detention and determined to be an enemy combatant. *Id.* at 792. A significant portion of the Court's analysis presented the history and origins of the writ of habeas corpus in order to determine the intended reach of the writ and how such intent may affect the plaintiffs' rights at issue. *See id.* at 739-52. Concluding that the privilege of the writ of habeas and the protections of the Suspension Clause reached those detainees, the Court further held that the MCA was not a formal suspension of the writ and that the plaintiffs were entitled to use it as a vehicle for challenging their detention. *Id.* at 771. Accordingly, because the process established by the DTA failed to present an adequate substitute for the writ of habeas corpus, the Court held that "MCA § 7 thus effects an unconstitutional suspension of the writ." *Id.* at 792.

In discussing the constitutionality of the MCA's application in that case, the Court only referenced and analyzed the habeas-related provision, Subsection 1 of MCA § 7(a), codified at 28 U.S.C. § 2241(e)(1), and whether alternative methods would be an acceptable substitute for the habeas process. *See id.* at 770-92. For this reason, courts examining *Boumediene* have generally held that the Court's decision applied only to what was § 2241(e)(1), in light of the Court's analysis of MCA § 7 solely in the context of a suspension of the writ of habeas corpus. As a matter of statutory construction, "courts seek to preserve as much of the statute as is still consistent with legislative intent; courts 'should refrain from invalidating more of the statute than is necessary . . . . [W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain

9

the act in so far as it is valid.'" *Pittston Co. v. United States*, 368 F.3d 385, 400 (4th Cir. 2004) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)). As a result, courts have almost unanimously found § 2241(e)(2), the provision addressing non-habeas matters such as Plaintiff's claims here, unaffected by *Boumediene*. *See Al-Zahrani*, 669 F.3d at 319 (holding that the plaintiff's claims were barred by "Subsection 2 of the MCA," codified at 28 U.S.C. § 2241(e)(2), because "[*Boumediene*'s] discussion of the Suspension Clause clearly indicates it was referring only to that part of [MCA] § 7 codified at § 2241(e)(1)"); *Kiyemba v. Obama*, 561 F.3d 509, 512 n.1 (D.C. Cir. 2009) (noting that *Boumediene*'s "discussion of the Suspension Clause clearly indicates it was referring only to that part of [MCA] § 7 codified at § 2241(e)(1)"); *Al-Zahrani*, 684 F. Supp. 2d at 108-09 (collecting district court cases reaching the same conclusion). *But see Hamad v. Gates*, No. C10-591, 2011 WL 6130413, at *3 (W.D. Wash. Dec. 8, 2011) (holding that *Boumediene* struck the MCA in its entirety as unconstitutional). The D.C. Circuit supported its reading in *Al-Zahrani* with the aforementioned presumption that repeal occurs only on the narrowest grounds possible; thus the court would not invalidate more than necessary of the MCA to bring it in conformity with the Constitution as explained in *Boumediene*. *Al-Zahrani*, 684 F. Supp. 2d at 109 (quoting *Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 118 (D.D.C. 2009) and *Brock*, 480 U.S. at 684). Therefore, § 2241(e)(2) remains in force, and thus claims by those designated enemy combatants seeking review of the conditions of treatment during detention "[are] excluded from the jurisdiction of this court by the 'plain language' of an Act of Congress [that] requires...dismissal of [the] claims." *Al-Zahrani*, 669 F.3d at 319.

Plaintiff advances the argument that the Supreme Court's broad language, which referred to § 7 of the MCA generally, rather than explicitly declaring unconstitutional MCA § 7(a)(1),

indicates that the entirety of MCA § 7, and thus the entirety of § 2241(e), is unconstitutional. In addition to the language in *Boumediene*, Plaintiff presents the decision in *Hamad v. Gates*, where the Western District of Washington held that the MCA did not bar the plaintiff's claims, which were substantively identical to Plaintiff in relevant facts and bases for relief. *Hamad*, 2011 WL 6130413, at *2-3. The court based its decision on "the plain language in *Boumediene*," and the fact that the two subsections were not severable from one another, thus leading the court to conclude that "§ 7(a)(2) textually cannot stand on its own." *Id.* at *3.

The Court finds *Hamad* to be an unpersuasive outlier in light of the scope of the Court's discussion in *Boumediene* and the directive to narrowly repeal legislative provisions. As noted above, *Boumediene*'s analysis reached only those matters affecting the writ of habeas corpus, which was impacted by § 2241(e)(1). To reach this conclusion, by looking at the reasoning of the Supreme Court's decision, is not speculative as *Hamad* suggests. *See Hamad*, 2011 WL 6130413, at *2. The plain language of the Court's holding constrained its examination and effect to habeas matters, never examining the effect on any actions other than collateral review afforded by the writ and protected by the Suspension Clause. *Boumediene*, 553 U.S. at 733, 792. The reason for the Court's invalidation in *Boumediene* was the Suspension Clause, evidenced by the fact that the invalidation was premised on the failure to comply with the Suspension Clause. *See id.* at 732, 771. Section 2241(e)(2) does not affect habeas jurisdiction, an observation clearly supported by the fact that the text indicates its applicability to "any other action" aside from habeas, which was addressed in § 2241(e)(1). Therefore, the Suspension Clause cannot impact its constitutionality, because it "is not relevant" to "treatment cases." *Al-Zahrani*, 669 F.3d at 319. On the matter of severability and distinguishing between the subsections of MCA § 7, the Court finds that these arguments fail to compel a broad reading of *Boumediene*. While no

severability clause appears in the MCA, which would indicate that Congress intended the subsections to be severable, courts should invalidate no more of a statute than necessary to remove the constitutional violation. *Pittston*, 368 F.3d at 400 (quoting *Brock*, 480 U.S. at 684). Furthermore, the Court does not find that *Boumediene*'s analysis supports Plaintiff's argument that the two provisions of MCA § 7(a) are interdependent. The portion of the opinion cited by Plaintiff discusses the structure of the statute for the purpose of determining whether the effective-date provision applied to pending cases within the definitions of the respective provisions. *See Boumediene*, 553 U.S. at 737-38. The Court does not read such discussion to infer that the clauses are not severable.

Furthermore, the Court notes that *Hamad*'s interpretation has been subsequently rejected by the same court. In *Al-Nashiri v. McDonald*, No. 11-5907, 2012 WL 1642306 (W.D. Wash. May 10, 2012), the Western District of Washington dismissed the plaintiff's claims as barred by § 2241(e)(2). *Id.* at *7. The court found that "[o]ther courts, but one, are in accord" with the position that "Section 2241(e)(2) remains valid and bar[red] federal district court review" of the plaintiff's claims regarding his detention in Guantanamo Bay prior to a trial for war crimes and involvement in terrorism. *Id.* (citations omitted). The "but one" referred to *Hamad*, and the court found *Hamad*'s conclusion unpersuasive in the face of *Al-Zahrani* and two other decisions from the District Court for the District of Columbia. *Id.* Thus, not only does *Hamad* fail to overcome the majority position the validity of § 2241(e)(2), it remains on shaky ground even in its own jurisdiction, a factor that counsels against its adoption here.

Because the Supreme Court's discussion focused exclusively on MCA § 7 in relation to the Suspension Clause, a broader invalidation, striking any provision other than § 2241(e)(1), is an overly expansive and improper reading of *Boumediene*. Thus, the Court finds that §

12

2241(e)(2) remains in force. As a result, the plain language of the statute positions Plaintiffs'

claims beyond the jurisdiction of the Court. Accordingly, the MCA compels dismissal of all of

Plaintiff's claims for lack of subject matter jurisdiction.[3]

### B. Sovereign Immunity Bars Plaintiff's Nonconstitutional Claims

In addition to the MCA's effect, the Court finds subject matter jurisdiction lacking as to

Plaintiff's nonconstitutional claims due to sovereign immunity. By operation of the *Westfall*

Act, Plaintiff may only seek relief on his nonconstitutional claims against the government under

the Federal Tort Claims Act, making a waiver of sovereign immunity necessary for the Court to

exert jurisdiction over his claims. These claims, presented against the United States, are beyond

the Court's jurisdiction because the Government has not waived immunity for claims based on

international law or occurring on foreign soil and Plaintiff failed to exhaust his administrative

remedies as to these claims. As a threshold matter necessary to reach this conclusion, the Court

must determine whether the United States properly substituted itself as the defendant on

Plaintiff's nonconstitutional claims by operation of the *Westfall* Act. If so, then the Court must

consider whether sovereign immunity has been waived as to Plaintiff's claims.

---

[3]     The Court declines the Individual Defendants' invitation to forego the issue of the
MCA's constitutionality and instead decide this matter on the grounds of qualified immunity and
the lack of a *Bivens* remedy. (*See* Individual Defs.' Reply at 1 n.1, Doc. 88.) The Court notes
that the district court in *Al-Zahrani* took this approach, choosing to bypass the question of the
MCA's effect and dismiss the claims for the very same reasons advocated in the Individual
Defendants' reply brief. *See Al-Zahrani v. Rumsfeld*, 684 F. Supp. 2d 103, 110-11 (D.D.C.
2010), *aff'd on other grounds sub nom. Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012).
This resulted in a dismissal on 12(b)(6) grounds, rather than a 12(b)(1) dismissal for lack of
subject matter jurisdiction. However, on appeal, the Court of Appeals for the District of
Columbia found the district court's 12(b)(6) analysis unnecessary to resolve the case because the
MCA's jurisdictional bar ended the matter. *Id.* at 317. Hence, having been satisfied that the
MCA applies to Plaintiff's claims, the Court finds unnecessary and imprudent any analysis of a
*Bivens* remedy or the effect of qualified immunity in this action.
        However, the Court will consider the Government's arguments on sovereign immunity
because that argument invokes a subject matter jurisdiction question rather than one of qualified
immunity, which arises in the 12(b)(6) context of stating a claim.

*1. The United States Properly Substituted Pursuant to the* Westfall *Act*

The Court finds that the United States properly substituted as Defendant in place of the individually-named defendants on Plaintiff's nonconstitutional claims, Counts I-VI. The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the *Westfall* Act, establishes a remedy against the United States as the exclusive remedy for claims of "injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1) (2012). Where the *Westfall* Act applies, a cause of action is transformed into one pursuant to the Federal Tort Claims Act ("FTCA"). *See, e.g., Ross v. Bryan*, 309 F.3d 830, 833 (4th Cir. 2002) (citing *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 426 (1995)). The *Westfall* Act provides two exceptions to the exclusivity provision: (1) suits alleging a violation of the Constitution and (2) suits alleging a violation of a statute authorizing action against the individual. 28 U.S.C. § 2679(b)(2). Substitution under the *Westfall* Act arises in suits against federal employees where the employee was acting within the scope of his office or employment at the time of the incident underlying the claim. 28 U.S.C. § 2679(d)(1). Thus, unless the aforementioned exceptions apply, the United States is the proper defendant for the activities and harms alleged here.

*a.* Westfall *Act Exceptions Do Not Apply*

The Court finds that neither exception applies in Plaintiff's case. The first *Westfall* exception arises where claims seek relief for a constitutional violation. 28 U.S.C. § 2679(b)(2)(a). Here, the United States only substituted on Counts I-VI, which all seek relief for violations of customary international law and the Geneva Convention ("nonconstitutional claims"). (*See* Compl. ¶¶ 122-52.) Counts VII-IX, which explicitly reference the First and Fifth

14

Amendments as well as the Religious Freedom Restoration Act, are not within the scope of the United States' substitution or this aspect of Defendant's motion. Thus, the first exception will not preclude substitution on Counts I-VI.

Similarly, the second *Westfall* exception is inapplicable because Plaintiff does not present claims in violation of a statute authorizing an action against an individual. Plaintiff alleges that these nonconstitutional claims are pursuant to the Geneva Convention, a treaty. Treaties are not statutes, as they do not invoke the bicameral legislative process required for what is commonly understood to be a statute. *See, e.g., In re Iraq & Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85, 112 (D.D.C. 2007) ("Treaties are not enacted by the legislative branch."). Thus, courts have previously rejected the notion that the Geneva Convention, or any other treaty, invokes the statutory exception to the *Westfall* Act. *See, e.g., Sobitan v. Glud*, 589 F.3d 379, 386 (7th Cir. 2009) (holding that claims brought pursuant to a treaty do not invoke the *Westfall* Act's exception because treaties are not the same as legislative acts). Furthermore, courts have held that the Geneva Convention may not be invoked "as a source of rights in any court of the United States" in a suit where the United States is a party. *Noriega v. Pastrana*, 564 F.3d 1290, 1296-97 (11th Cir. 2009). Accordingly, Plaintiff's reliance on the Geneva Convention will not permit a suit against the Individual Defendants.

The Court also rejects Plaintiff's reliance on the Alien Tort Statute ("ATS") as a vehicle for invoking the *Westfall* Act's statutory exception. Plaintiff argues that the ATS is not merely a jurisdictional statute but also provides a cause of action. (Pl.'s Opp'n at 9-10.) To the contrary, the Supreme Court has recently emphasized that the ATS "does not expressly provide any causes of action," but merely "provides district courts with jurisdiction to hear certain claims." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1663 (2013); *see also Sosa v. Alvarez-Machain*,

542 U.S. 692, 713 (2004) (finding it "implausible" that the ATS "was intended . . . as authority for the creation of a new cause of action for torts in violation of international law").

Accordingly, the ATS has been held as insufficient for invocation of the *Westfall* Act's statutory exception. *See Al-Zahrani v. Rumsfeld*, 684 F. Supp. 2d 103, 115-16 (D.D.C. 2010), *affirmed on other grounds by Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012) (holding that "*Sosa* and its progeny" indicate that "the ATS is not a violable statute" invoking an exception to the *Westfall* Act); *Detainees Litig.*, 479 F. Supp. 2d at 112 (holding that "the plaintiffs cannot rely on the Alien Tort Statute to waive the Westfall Act because the plaintiffs have no claim for a violation of that statute itself"). The Court follows this established view and holds that the ATS cannot support Plaintiff's challenge to the *Westfall* Act's application here.

   *b. Virginia's Scope of Employment Law Applies to the Westfall Act's Application*

   As noted by the *Westfall* Act's text, substitution by the United States occurs "upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(2). Once the Attorney General makes this certification, a plaintiff may only pursue his claims against the Government pursuant to the FTCA. *Ross*, 309 F.3d at 833. The Attorney General's certification regarding an employee's scope of employment is conclusive unless challenged. *Gutierrez de Martinez v. Drug Enforcement Agency*, 111 F.3d 1148, 1153 (4th Cir. 1997) (citation omitted); *Feldheim v. Turner*, 743 F. Supp. 2d 551, 555 (E.D. Va. 2010) (citing *Gutierrez de Martinez*, 111 F.3d at 1153). Where, as here, a plaintiff challenges whether an individual acted within the scope of their employment, the Attorney General's certification is prima facie evidence of the issue. *Gutierrez de Martinez*, 111 F.3d at 1153, 1155. In light of this prima facie evidence, the plaintiff carries the "burden [of] prov[ing], by a preponderance of the

evidence, that the defendant federal employee was acting outside the scope of his employment." *Id.* at 1153-55 (citations omitted). Where the plaintiff carries this burden with satisfactory evidence, the Government may present evidence to support its certification and the court may thereafter permit discovery if necessary. *Id.* at 1155.

Here, the Attorney General certified that the actions occurred within each individual's scope of employment and Plaintiff challenges the accuracy of such certification so as to require substitution by the United States. (*See* Certification of Scope of Employment, Doc. 79-1; Pl.'s Mem. Opp'n to United States' Substitution & Mot. to Dismiss at 12-16, Doc. 84 ["Pl.'s Opp'n to Gov't Mot."].) The crux of the parties' disagreement is whether state or federal law applies to the scope of employment determination. The Government posits that the Individual Defendants' actions occurred within the scope of their employment as defined by Virginia law. (*See* United States' Mem. Supp. Mot. to Dismiss at 5-8, Doc. 81 ["Gov't Mem."].) Conversely, Plaintiff argues that the federal nature of the rights at issue, the application of a federal law governing substitution, and the potential effect of immunity compel the application of federal common law to uniquely federal interests. (*See* Pl.'s Opp'n to Gov't Mot. at 12-16.)

The Court holds that state law governs this inquiry, and thus whether the *Westfall* Act applies hinges on a determination that an individual employee acted within the scope of his employment as defined by Virginia law. The Fourth Circuit has remained steadfast for the past twenty years in its application of state law to the *Westfall* Act's scope of employment analysis. *See Ross*, 309 F.3d at 834; *Borneman v. United States*, 213 F.3d 819, 827 (4th Cir. 2000); *Maron v. United States*, 126 F.3d 317, 323-24 (4th Cir. 1997); *Gutierrez de Martinez*, 111 F.3d at 1156; *Jamison v. Wiley*, 14 F.3d 222, 237 (4th Cir. 1994); *Johnson v. Carter*, 983 F.2d 1316, 1322 (4th Cir. 1993), *overruled on other grounds by Gutierrez de Martinez v. Lamagno*, 515 U.S. 417

(1995). While the Fourth Circuit's position alone compels but one resolution of this dispute, the Court notes that this position mirrors that of other circuits. *See Aversa v. United States*, 99 F.23d 1200, 1209 (1st Cir. 1996) (collecting cases from the First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Eleventh, and D.C. circuits applying state law to the scope of employment analysis for *Westfall* Act cases). In *Jamison*, the Fourth Circuit noted a uniform rejection of the alternative Plaintiff now proposes, citing cases recognizing that "whether particular conduct was 'within the scope of employment' for purposes of *Westfall* Act immunity was to be determined *not* by reference to a uniform body of federal common law, but by reference to the respondeat superior law of the state in which the conduct occurred." 14 F.3d at 227 n.2 (emphasis in original). Therefore, Plaintiff's argument for the application of federal common law is unpersuasive in the face of a wave of authority requiring the application of state law. Furthermore, Plaintiff's reliance on the federal nature of his ATS claims as requiring the application of state law fails as well. Plaintiff argues that the federal nature of his claims should compel the application of federal law in defining defenses to his claims. However, this argument falters not only in light of binding authority but also because the immunity offered by the *Westfall* Act "is an immunity from suit rather than a mere defense." *Gutierrez de Martinez*, 111 F.3d at 1154 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Thus, the Court will apply state law in determining whether the Individual Defendants' actions fell within the scope of their employment.

Virginia's scope of employment test has been recognized as "a fairly broad view" of the concept, as it even includes intentional torts at times. *Gutierrez de Martinez*, 111 F.3d at 1156 (citing *Plummer v. Ctr. Psychiatrists, Ltd.*, 476 S.E.2d 172, 174-75 (Va. 1996) and *Commercial*

18

*Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 453 S.E.2d 261, 266 (Va. 1995)). Under Virginia law, an

employee acts within the scope of his employment where

> (1) [The act] was expressly or impliedly directed by the employer, or is naturally
> incident to the business, and

> (2) it was performed, although mistakenly or ill-advisedly, with the intent to
> further the employer's interest, or from some impulse or emotion that was the
> natural consequence of an attempt to do the employer's business, "and did not
> arise wholly from some external, independent, and personal motive on the part of
> the [employee] to do the act upon his own account."

*Id.* (quoting *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987)).

Considering this wide scope afforded by Virginia law, the Court finds that the

employees' actions were within the scope of their employment. Plaintiff fails to meet his burden

in demonstrating that the Individual Defendants' actions were not within the scope of

employment as defined by Virginia law. Plaintiff contends that the refusal to release him was a

product of the individuals' "fear of political repercussions—not for purposes of serving the

master." (Pl.'s Opp'n at 18.) The Court rejects this argument, and the respective allegations in

the Complaint in support of such argument, because the existence of political repercussions does

not somehow detach the acts or omissions from the effects of the individuals' positions. Indeed,

even assuming that political repercussion was the motivating factor in the Individual Defendants'

acts and omissions, this explanation appears to be the epitome of an "impulse or emotion that

was the natural consequence of an attempt to do the employer's business." *Gutierrez de

Martinez*, 111 F.3d at 1156. Political repercussion would be of no consequence to one not in a

position subject to political scrutiny during times of conflict abroad.

Furthermore, Plaintiff's argument that *jus cogens* violations sufficiently rebut the

Attorney General's certification is equally unavailing. Plaintiff relies on the Fourth Circuit's

recent holding in *Yousef v. Samantar*, 699 F.3d 763 (4th Cir. 2012), for the position that under

federal common law, officials are not entitled to immunity for *jus cogens* violations of

international law such as torture and prolonged arbitrary detention. (Pl.'s Opp'n at 16-17.) In

*Samantar*, the court held that, because *jus cogens* violations are not authorized acts of a

sovereign, "officials from other countries are not entitled to foreign official immunity for *jus

cogens* violations" resulting from acts performed while serving in an official capacity. *Id.* at

776-77. Plaintiff offers the Fourth Circuit's opinion as a subset of its federal common law

argument, which, as noted earlier, conflicts with the Fourth Circuit's well-established position on

the proper law to apply. Because the *Samantar*'s ruling applied to federal common law, it cannot

be said that the holding applies with equal force to Virginia's scope of employment test or its

application. Furthermore, in applying Virginia's scope of employment factors, the activities of

the Individual Defendants, namely the conduct of military operations involving detention and

interrogation, were incident to and a natural consequence of their employer's business, as

required by Virginia's scope of employment analysis. *Cf. Detainees Litig.*, 479 F. Supp. 2d at

114 (rejecting an argument that the defendants' alleged *jus cogens* violations fell outside of the

scope of their employment because "there can be no credible dispute that detaining and

interrogating enemy aliens would be incidental to their overall military obligations"). Thus,

Plaintiff's reliance on *Samantar* fails to rebut the Attorney General's certification.

Finally, Plaintiff's argument that a jury should determine the scope of employment fails

also. The Court has recently explained that, in light of Supreme Court precedent, questions

regarding scope of employment certification are decided by the court, not the jury. *Brown v.

United States*, No. 1:13-CV-174, 2013 WL 1233934, at *2 (E.D. Va. Mar. 8, 2013) (citing

*Gutierrez de Martinez*, 515 U.S. at 436-37). Accordingly, a plaintiff is not entitled to a jury trial

on scope of employment issues even if the relevant state law would provide a jury trial on such issues. *Id.* (citing *Gutierrez de Martinez*, 111 F.3d at 1153). In light of these principles, Plaintiff's reliance on Virginia Supreme Court decisions in *Plummer* and *Commercial Business Systems* fails, as those cases will not infuse the right to a jury determination in the Court's determination of whether the *Westfall* Act applies here.

For these reasons, the Court finds that the United States is the proper defendant on Plaintiff's nonconstitutional claims. The *Westfall* Act applies to Counts I-VI because neither exception to the *Westfall* Act applies to those counts and the Individual Defendants acted within their respective scope of employment as defined by Virginia law.

*2. Sovereign Immunity Bars Plaintiff's Nonconstitutional Claims*

Having determined that the United States is the proper defendant with respect to the nonconstitutional claims and Plaintiff may only pursue his claims under the FTCA, the Court finds dismissal appropriate as a result of sovereign immunity.[4]

It is axiomatic that the United States is immune from suit without its consent. *See, e.g.*, *Bullock v. Napolitano*, 666 F.3d 281, 284 (4th Cir. 2012) (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Waiver of such immunity must be expressed unequivocally by Congress. *Mun. Ass'n of S.C. v. USAA Gen. Indem. Co.*, 709 F.3d 276, 285-86 (4th Cir. 2013) (quoting *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 33 (1992)). While the FTCA waives the Government's immunity from suit, *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 492 (2006), this waiver is limited to "circumstances where the United States, if a private person, would be liable

---

[4]     Notwithstanding the applicability of the factors presented below, Plaintiff failed to rebut the Government's arguments regarding exhaustion and exceptions to the FTCA sovereign immunity waiver. Plaintiff's failure to respond is grounds for the Court to deem these arguments conceded. *See Barley v. Merrifield Town Ctr. Ltd. P'ship*, 580 F. Supp. 2d 495, 502 n.3 (E.D. Va. 2008).

to the claimant in accordance with the law of the place where the act or omission occurred." 28

U.S.C. § 1346(b)(1); *Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2012) (quoting *FDIC v.*

*Meyer*, 510 U.S. 471, 475, 477 (1994)). The "law of the place" refers to state law only. *Kerns*,

585 F.3d at 194. Thus, violations of customary law or international law do not trigger the waiver

expressed in § 1346(b)(1). *See Sobitan*, 589 F.3d at 389 ("If the plaintiff's claim is not

cognizable under state tort law, it does not fall within the sovereign's waiver of immunity and

must be dismissed."); *Al Janko v. Gates*, 831 F. Supp. 2d 272, 283 (D.D.C. 2011) (holding that

violations of customary international law "are not covered under the FTCA's limited waiver").

Therefore, Plaintiff's nonconstitutional claims, predicated on customary international law and

Geneva Convention violations, do not invoke the FTCA's sovereign immunity waiver.

Furthermore, the "foreign country" exception also applies to Plaintiff's claims and

requires dismissal. Another exception to the FTCA's limited waiver is "[a]ny claim arising in a

foreign country." 28 U.S.C. § 2680(k); *Galustian v. Peter*, 802 F. Supp. 2d 700, 706-07 (E.D.

Va. 2011). This exception applies where the injury is "suffered in a foreign country, regardless

of where the tortious act or omission occurred." *Sosa*, 542 U.S. at 712. In light of this rule, the

place of Plaintiff's injury—Afghanistan and Cuba—controls the issue rather than the place of the

allegedly tortious acts—Virginia. Because the former occurred in a foreign country,[5] the

FTCA's waiver of sovereign immunity does not apply to Plaintiff's nonconstitutional claims. *Cf.*

---

[5]     The term "foreign country" applies to those "territor[ies] subject to the sovereignty of
another nation." *United States v. Spelar*, 338 U.S. 217, 219 (1949). While Guantanamo is
subject to some degree of control by the United States, courts have repeatedly recognized that,
for FTCA waiver purposes, "Cuba, not the United States, maintains sovereignty, in the legal and
technical sense of the term, over Guantanamo Bay." *Boumediene*, 553 U.S. at 754; *Al-Zahrani*,
684 F. Supp. 2d at 119; *Al Janko*, 831 F. Supp. 2d at 284 & n.22; *cf. Bird v. United States*, 923 F.
Supp. 338, 343 (D. Conn. 1996) (finding plaintiff's claim barred by the FTCA because
"sovereignty over the Guantanamo Bay does not rest with the United States").

*Al Janko*, 831 F. Supp. 2d at 284 n.23 (explaining that *Sosa* "squarely foreclosed" any argument that the foreign country exception could be circumvented by the occurrence of acts in Washington, D.C. that caused conduct in Afghanistan and Cuba).

For these reasons, the Court finds that, in the alternative to the application of the MCA, sovereign immunity bars Plaintiff's nonconstitutional claims against the United States and thus deprives the Court of subject matter jurisdiction on these claims.[6]

## IV. CONCLUSION

The Court grants both the United States and the Individual Defendants' Motions to Dismiss because the Court lacks jurisdiction to hear Plaintiff's claims. The Military Commissions Act bars adjudication of all of Plaintiff's claims. Furthermore, Plaintiff's nonconstitutional claims against the United States, Counts I-VI, are barred by sovereign immunity. Therefore,

**IT IS HEREBY ORDERED** that the Defendants' Motions to Dismiss (Docs. 77, 80) are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Complaint is **DISMISSED without prejudice**;

---

[6] Even if the United States waived sovereign immunity here, Plaintiff does not plead exhaustion of his claims. Exhaustion of administrative remedies, by presentment of a claim to the appropriate agency, is a necessary prerequisite to pursuing an FTCA claim in federal court. 28 U.S.C. §§ 1346(b), 2671-2680; *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir. 1994). This jurisdictional requirement may not be waived. *Ahmed*, 30 F.3d at 516. Thus, the Second Amended Complaint's omission of allegations demonstrating exhaustion would compel dismissal as well. *Cf. Ali v. Rumsfeld*, 649 F.3d 762, 775 (D.C. Cir. 2011) (citations omitted) (affirming the district court's dismissal for lack of subject matter jurisdiction where "the record is devoid . . . of any suggestion the plaintiffs filed an administrative claim with [the Department of Defense] or a military department").

**IT IS FURTHER ORDERED** that this Memorandum Opinion supersedes the Court's oral order on April 12, 2013 and accompanying Order of the same date. Accordingly, the Court's April 12, 2013 Order (Doc. 90) is hereby **VACATED**.

This Memorandum Opinion and Order constitutes the Court's final order, and the time for appeal shall run from the entry of this Order.

**IT IS SO ORDERED.**

ENTERED this _____ day of June, 2013.

Alexandria, Virginia
6 /    / 2013

/s/
Gerald Bruce Lee
United States District Judge